United States District Court
Southern District of Texas

**ENTERED**

November 30, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STOLLER ENTERPRISES, INC. *et al.*,    §
                                        §
        *Plaintiffs*,                   §
                                        §
v.                                      §    CIVIL ACTION NO. 4:20-cv-00750
                                        §
FINE AGROCHEMICALS LTD., *et al.*,      §
                                        §
        *Defendants*.                   §

## ORDER

Pending before the Court are Plaintiffs Stoller Enterprises, Inc., The Stoller Group, Inc., and Stoller USA, Inc.'s (collectively, "Stoller" or "Plaintiffs") Motions for Partial Summary Judgment (Doc. Nos. 153, 154, 155, 156), Defendants Fine Agrochemicals Ltd., Fine Americas Inc.'s (collectively, "Fine"), CJB Industries Inc ("CJB"), and Vivid Life Sciences, LLC ("Vivid") (collectively, "Defendants") Motion for Summary Judgment (Doc. No. 159), and the parties' replies thereto.

Having considered the extensive briefings and applicable law, the Court hereby **DENIES** Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 153), **GRANTS** Plaintiffs' Motions for Partial Summary Judgment (Doc. Nos. 154, 155, 156), and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (Doc. No. 159).

## I.    Background

This case arises out of a patent infringement dispute. Both parties develop and sell plant growth regulators ("PGRs") (Doc. No. 109 at 3). Plant growth regulators are chemical substances that are sprayed or applied to a plant to influence the growth and differentiation of plant cells, tissues, and organs. Stoller owns the two patents at issue in this case: (1) U.S. Patent No. 10,104,883 ("'883 Patent") issued on October 23, 2018, and (2) U.S. Patent No. 10,980,229

("'229 Patent") issued on April 20, 2021. (*Id.*). Fine developed and sold PGRs across the United States with the help of codefendants CJB and Vivid. Generally speaking, CJB was Fine's contract manufacturer assigned to make the PGRs, and Vivid was Fine's distributor assigned to sell the PGRs.

Stoller brings this action for patent infringement and inducement of infringement under 35 U.S.C. § 271, *et seq.* Specifically, Stoller contends Defendants knowingly and willfully made, used, sold, and/or offered for sale products embodying its patented invention that constitute infringement of claims 1 through 20 of the '883 Patent and claims 1 through 21 of the '229 Patent. (Doc. No. 109 at 4). The allegedly infringing products include Fine's products sold as Registration Names FAL 1770-1703, 1710, 1780, 1781, 1783, 1785, 1786, and 1788 and sold, occasionally, under the brand names Vigeo®, Periscope, Hone, Crest, Advantigro®, Mascrop, and Maxport. (*Id.* at 3). According to Stoller, Defendants have been aware of the '883 Patent since at least November 2018, when Stoller sent CJB and Vivid notice letters pointing out that they were infringing the '883 Patent. Stoller concludes that Defendants have been aware of the '229 Patent since its issuance, as it occurred during this litigation. (*Id.* at 8). Stoller alleges that despite knowing about the '883 and '229 Patents, Fine continued its infringement. (*Id.* at 9). Stoller also alleges that Fine induced non-party WinField Solutions, Inc. ("WinField") to infringe both '883 and '229 Patents through its products, Ascend SL and Ascend Pro. (*Id.* at 10).[1]

In their Answer, Defendants denied the pertinent allegations and asserted several affirmative defenses and counterclaimed seeking a finding that the '883 and '229 Patents are invalid and/or unenforceable for various reasons. (Doc. No. 111).

---

[1] WinField Solutions is another company in the PGR industry, sometimes referred to as WinField United, RSA MicroTech, at 510 E. Trail Street, Dodge City, KS 67801, or Land O'Lakes, Inc. (Doc. No. 153 at 4).

### A. The '883 Patent

According to Stoller's Fourth Amended Complaint, Stoller is the patentholder of the '883 Patent, entitled "Non-aqueous solution of plant-growth regulator(s) and polar and/or semi-polar organic solvent(s)," issued on October 23, 2018. (Doc. No. 1 at 5). The '883 Patent "related to non-aqueous solutions of plant growth regulator(s) and polar and/or semi-polar organic solvents, methods for making said non-aqueous solution, and methods for improving the growth and crop productivity of plants using said non-aqueous solution." (Doc. No. 1-1, Ex. A, 1:18-22). As described, the patent is directed to formulations for solutions of PGRs in organic solvents for application to crops and other plants.

On November 27, 2018, Stoller's counsel wrote to both Vivid and CJB, asserting that Fine's formulations under brand name "VIGEO" infringes on one or more claims of the '883 Patent. These allegations led to the instant lawsuit. Here, Stoller alleges that Fine, Vivid, and CJB infringe the '883 Patent with the following brand name products: Vigeo®, Periscope, Hone, Crest, Advantigro®, Mascrop, and Maxport. (Doc. No. 109 at 3).

### B. The '229 Patent

According to Stoller's Fourth Amended Complaint, Stoller is also the patentholder of the '229 Patent, entitled "Non-Aqueous Solution of Plant-Growth Regulator(s) and Polar and/or Semi-Polar Organic Solvent(s)," issued on April 20, 2021. (Doc. No. 109 at 4). The '229 Patent "generally relates to non-aqueous solutions of plant growth regulator(s) and polar and/or semi-polar organic solvent(s), methods for making said non-aqueous solution, and methods for improving the growth and crop productivity of plants using said non-aqueous solution." U.S. Patent No. 10,980,229 col. 1 ll. 24–29 (filed Jun. 3, 2019). As Stoller describes it, the patent is

3

directed to "formulations for solutions of PGRs in organic solvents for application to crops and other plants." (Doc. No. 94 at 5).

Stoller alleges that Fine, CJB (manufacturer for Fine), and Vivid (marketer for Fine) have engaged in direct or induced infringement of the '229 Patent with respect to various product formulations. (Doc. No. 109 at 7–8, 12–14). Stoller's application for the '229 Patent was a continuation of Application No. 16/131,998, filed on September 14, 2018, now abandoned, which was a continuation of Application No. 14/995,434, filed on January 14, 2016, now United States Patent No. 10,104,883. Thus, the '883 Patent is the parent of the '229 Patent.

### C. This Dispute

This Court has previously conducted *Markman* hearings and issued Orders on Claim Construction for the '883 and '229 Patents. (Doc. Nos. 97, 145). The Court construed the disputed terms and phrases as summarized below:

| '883 Patent | |
| --- | --- |
| **Disputed Term** | **Court's Construction** |
| "stable" | Satisfies the EPA Stability Guidelines and excludes acid solubilizers, such as citric acid, tartaric acid, or glycolic acid |
| "various forms of zeatin" | indefinite |
| "other chemical formulations with cytokinin activity" | Substances that behave like the listed cytokinins to promote cell division, or cytokinesis, in plants |
| '229 Patent | |
| "solution" | Plain and ordinary meaning |
| "about" | Plain and ordinary meaning |

Here, Defendants filed a Motion for Summary Judgment (Doc. No. 159) arguing that (1) the presence of citric acid in the Accused Products precludes infringement of the '883 Patent, (2)

the '229 Patent is invalid and unenforceable due to the "on-sale" bar, and (3) Plaintiffs are not entitled to enhanced damages as a matter of law because there is no evidence of willful infringement. Plaintiffs responded in opposition (Doc. No. 160) and Defendants replied (Doc. No. 174). Plaintiffs also filed four Motions for Summary Judgment: (1) a Motion for Partial Summary Judgment as to Fine's Inducement of Infringement claim (Doc. No. 153); (2) a Motion for Partial Summary Judgment Against Fine's Non-Infringing Alternatives claim (Doc. No. 154); (3) a Motion for Summary Judgment on Defendant's Invalidity Defenses of Anticipation and Obviousness (Doc. No. 155); and (4) a Motion for Summary Judgment as to Counterclaims and Affirmative Defenses Asserting Inequitable Conduct (Doc. No. 156).

## II.     Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a

5

summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III.   Analysis—Defendants' Motion for Summary Judgment

The Court first considers Defendants' Motion for Summary Judgment (Doc. No. 159), which addresses the central dispute of this case: whether the '883 and '229 Patents have been infringed. This Motion presents three main arguments: (1) Fine's products cannot have infringed any claim of Stoller's '883 Patent because its products contain citric acid; (2) Fine's products cannot have infringed Stoller's '229 Patent because the '229 Patent is invalid under the "on-sale" bar due to Fine's alleged prior sale of its MK-1 formulation ("MK-1") to third party WinField; and (3) Fine could not have "willfully" infringed either patent for the purposes of enhanced damages because it has a good faith belief that the '883 and '229 Patents were not infringed and are invalid, respectively. (Doc. No. 159 at 1).

Finding there to be a genuine issue of material fact with regards to the first argument, this Court DENIES Defendants' Motion as to infringement of the '883 Patent. As for the '229 Patent, the Court finds that the "on-sale" bar does not apply, and as such, DENIES Defendants' Motion as to infringement of this patent as well. With regard to Fine's third argument, willfulness, the Court finds that Stoller has failed to raise a fact issue showing willful infringement. The Court thus GRANTS summary judgment to Defendants on this issue.

6

## A. Infringement of the '883 Patent

Stoller alleges that Fine has infringed on claims 1 and 2, 5 through 8, and 10 through 19 of the '883 Patent (collectively, the "Asserted Claims"). Claims 1, 2, and 18 are independent claims. Claims 5 through 8, 12, and 14 depend on claim 1; claims 10, 11, 13, and 15 through 17 depend on claim 2; and claim 19 depends on claim 18. Stoller alleges that Fine's FAL 1170, 1780, 1781, 1783, 1785, 1786, and 1788 formulations (collectively "the Accused Products") infringe these claims.

Defendants argue that they are entitled to summary judgment on infringement of all of the above claims of the '883 Patent for two reasons.

First, Defendants argue that Accused Products are beyond the scope of the claimed solutions in the '883 Patent and cannot literally infringe because they contain 0.1% citric acid. The presence of citric acid, Defendants argue, puts the Accused Products outside of the Court's definition of "stable," which "excludes Acid Solubilizers, such as citric acid." Thus, the Accused Products are not covered by the '883 claims and cannot infringe as a matter of law. (Doc. No. 159 at 12).

Second, Defendants argue prosecution history estoppel applies to the '883 Patent. Specifically, they argue that Stoller's arguments and amendments made during prosecution of the '883 Patent preclude Stoller from arguing infringement under the Doctrine of Equivalents. (*Id.* at 10). They argue that Stoller essentially forfeited coverage of a solution including 0.1% citric acid through representations made to procure issuance of the patent. The Court will address these two arguments in turn.

**1.** Literal Infringement and Claim Construction

Defendants' first argument seeks summary judgment on the issue of literal infringement. To grant or deny summary judgment on literal infringement, the Court must construe the scope and meaning of claims and then compare the construed claims to the accused products. *Abbott Labs v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). Thus, to address Defendants' first argument—that the presence of 0.1% citric acid precludes literal infringement on the '883 Patent—the Court must first look closer at the scope of the '883 claims and the term "stable." Each of the independent claims (1, 2, and 18) expressly sets out that the "non-aqueous solution is stable." The Court addressed the meaning of the word "stable" in its Memorandum and Order on Claim Construction ("'883 *Markman* Order"). In the '883 *Markman* Order, the Court adopted Defendants' construction of "stable" and, consequently, ruled that a solution is "stable" if it "satisfies the EPA Stability Guidelines and **excludes acid solubilizers, such as citric acid**, tartaric acid, or glycolic acid." (Doc. No. 97 at 2) (emphasis added).

As part of its reasoning, this Court found that Stoller "clearly and unambiguously disclaimed [their proposed] full scope of the term 'stable' during [the '883] patent prosecution by arguing that acid solubilizers such as citric acid, tartaric acid, or glycolic acid make the claimed stable solution *unstable*." (*Id.* at 5). In addition, this Court found that "acid solubilizers, such as citric acid would render [Stoller's] solutions not stable and therefore beyond the scope of the claimed solutions." (*Id.* at 8).

Fine produced formula cards for each of the Accused Products. Each lists citric acid in amounts of 0.10%w/w. (Doc. No. 159-4, Ex. C). According to Fine, Stoller does not dispute that every Accused Product contains citric acid.[2] (Doc. No. 159). Fine concludes that a solution

---

[2] While Stoller may not dispute *the fact* that the Accused Products contain citric acid, the *quantity* of that citric acid is hotly contested. The Court will address this dispute later.

containing citric acid is, therefore, by definition unstable and, therefore, cannot infringe the '883 Patent.

The central dispute, then, is how to interpret the Court's construction of the word "stable" in the context of the '883 Patent. As previously noted, the Court found that to be "stable," a solution must "[satisfy] the EPA Stability Guidelines and **exclude[] acid solubilizers, such as citric acid**, tartaric acid, or glycolic acid." The Court finds that Defendants' interpretation, which would automatically exclude any solution with any amount of citric acid, improperly eliminates the term "acid solubilizer" from the definition of stable. Under the Court's construction, the direct object of the verb "excludes" is acid solubilizer, not citric acid. Citric acid is listed only as an example of a possible acid solubilizer. Therefore, it is "acid solubilizer" that makes or breaks whether a solution is stable under the Court's definition.

Inherent in the word "acid solubilizer" is its function: to solubilize (increase solubility of a solution). Citric acid has no inherent function; it is basically only a chemical. Citric acid, alone, can serve any number of functions. For example, it can be a preservative or pH regulator. What matters is how it interacts with other chemicals in the solution, and this interaction can be affected by the quantity of citric acid as well as the manner in which it is added to the solution.

The Court finds that there is a genuine fact issue as to whether the citric acid contained in the Accused Products functions as an acid solubilizer, and so it cannot say as a matter of law that the Accused Products do not infringe. Specifically, there is a fact issue regarding what function citric acid serves in Fine's formulations. For instance, according to Stoller's expert, citric acid cannot solubilize the active ingredients in Fine's formulations because it is added *after* the active ingredients are already dissolved. (Doc. No. 148-3, Appx. Tab 3, fn 6). Stoller argues that adding citric acid to a solution after the active ingredients are fully dissolved renders citric acid a

9

preservative, not an acid solubilizer. (Doc. No. 160 at 8). As Stoller points out, the independent claims of '883 allow for an optional preservative. (Doc. No. 1-1 at 7). Therefore, if citric acid functions as a preservative, as opposed to a solubilizer, in Fine's solution, its presence would not necessarily move Fine's solution outside the scope of the '883 Patent.

Also, Fine's EPA filings and filings with Brazilian regulators indicate that citric acid is used as a pH regulator. *See* (Doc. No. 160-2, Appx. Tab 33, FINE1158, 1160, 1181). Fine's Confidential Statement of Formula for at least one of the Accused Products also shows that citric acid is added as a pH regulator. (Doc. 160-2, Appx. Tab 33, FINE3211). Finally, Fine's own Technical Director, Philip Wikeley, seemed unable to explain citric acid's function during his deposition. (Doc. No. 160-2, Appx. Tab 31, Wikeley Depo. at 114:22–24).

This uncertainty, together with the factual inconsistencies above, raises a fact issue regarding whether the citric acid in the Accused Products is acting as an acid solubilizer. As such, the Court cannot say as a matter of law that the Accused products do not infringe on the '883 Patents. Accordingly, the issue of literal infringement must be resolved by the finder of fact. *See Centennial Molding, LLC v. Carlson*, 401 F.Supp.2d 985, 990 (D. Neb. 2005) ("whether the accused product infringes the asserted claim is a question of fact, to be submitted to a jury").

## 2. Doctrine of Equivalents and Prosecution History Estoppel

Separately, Defendants also argue that prosecution history estoppel prevents Stoller from alleging infringement to solutions containing citric acid. Specifically, Defendants contend that Stoller's arguments and amendments during prosecution of the patent preclude it from making infringement arguments under the doctrine of equivalents. (Doc. No. 159 at 14). In addition to literally infringing, an accused product may infringe a patent claim under the "Doctrine of Equivalents." *Carlson*, 401 F.Supp.2d at 992. Under the doctrine of equivalents, patent

10

infringement may be found if the accused product performs substantially the same function, in substantially the same way, to obtain substantially the same results as the claimed invention. *Innovad v. Microsoft Corp.*, 99 F.Supp.2d 767 (N.D. Tex. 2000).

A patentee's ability to assert infringement through the doctrine of equivalents is limited by the doctrine of prosecution history estoppel. Under this doctrine, a patentee may be estopped from relying on the doctrine of equivalents if it made a narrowing amendment for purposes of patentability, or otherwise clearly and unmistakably surrendered the subject matter by arguments made to an examiner. *See Eagle Comtronics, Inc. v. Arrow Communications Laboratories, Inc.*, 305 F.3d 1203 (Fed. Cir. 2002). Here, Defendants argue that the prosecution history precludes Stoller from claiming coverage of solutions with 0.1% citric acid because statements made by Stoller during patent prosecution "surrendered" this equivalent.

According to Defendants, Stoller narrowed the claims of its '883 Patent to include only "stable" solutions and represented to the United States Patent and Trade Office ("USPTO") that the formulation is "not stable with the addition of acid solubilizers." (Doc. No. 159-23, Ex. V. at Stoller 89–95, 118). Specifically, Defendants rely on a declaration made by Dr. Ritesh Sheth, one of the '883 Patent's named inventors, to the USPTO in obtaining the '883 Patent. The declaration states that the inclusion of acid solubilizers, like citric acid, at concentrations as low as 0.1% causes a "complete loss of gibberellins and a significant loss of auxins within one day." (Doc. No. 159-22, Ex. U, Sheth Decl.). Based upon this comment, Defendants claim that Stoller cannot now assert infringement against a product containing citric acid under the doctrine of equivalents because the '883 Patent covers only stable solutions. They argue Fine was reasonably entitled to conclude that Stoller relinquished coverage of any solution containing 0.1% citric acid.

In response, Stoller contends that Defendants "cannot credibly assert that [Stoller] somehow disclaimed the presence of citric acid in quantities so small that it could not possibly have any effect on the product." (*Id.*). Stoller once again notes that, if anything, it disclaimed the use of acid solubilizers, not the mere presence of citric acid. To the extent that it disclaimed acid solubilizers, Stoller claims that it was only related to concentrations "as low as 0.1 percent." (Doc. No. 149-4, Appx. Tab 7).   In other words, it appears that Stoller objects to Fine's application of the prosecution history estoppel doctrine for two reasons. Stoller argues that, if the Court were to find that there was narrowing language in the patent prosecution, that narrowing should be applied (1) to acid solubilizers and not to citric acid generally, and (2) to concentrations only as low as 0.1%. Stoller asserts that there is a fact issue regarding the function and concentration of Fine's citric acid, making summary judgment improper. The Court agrees.

Seeing as the Court already found that a fact dispute existed regarding the *function* of citric acid, the Court will now address the second issue Stoller raises—whether there is a fact issue regarding the *concentration* of citric acid. Stoller asserts that the amount of citric acid in Fine's Accused Products is materially disputed. (*Id.*). Based on its own testing, Stoller found that the citric acid content of the Accused Products to be "well below the 0.1 [percent] claimed on [Fine]'s labels" and that the amount present was too low to have any noticeable effect on the product. (Doc. No. 148-3, Prestwich Report, ¶ 155, Table 6).[3] Furthermore, Stoller argues that CJB, the manufacturer of Fine's Accused Products, does not even test for citric acid in its Certificates of Analysis because citric acid is present in such minimal quantities. (Doc. No. 160-

---

[3] Defendants object to the reliability of Stoller's testing. They argue that Stoller used year-old samples, and that the concentration of citric acid naturally decreases over time. (Doc. No. 174). As such, the samples did not accurately reflect the initial product Fine formulated. The Court notes that reliability and credibility of a party's scientific testing is an issue best left to the jury. The jury may ultimately decide the accuracy of Stoller's testing with the benefit of hearing both parties' experts. Consequently, the Court cannot, as a matter of law, completely discredit Stoller's expert testing as Defendants would like; instead, the Court must recognize that Stoller's testing, at the very least, raises a fact issue on summary judgment.

6, Appx. Tab 35). Finally, Stoller notes that, aside from formula cards, Fine has not presented any evidence that its products actually contain 0.1% citric acid. The Court agrees with Stoller and finds that the evidence raises a fact issue regarding the concentration of citric acid present. Therefore, even if Stoller is estopped in general, there is still a fact issue of whether that estoppel would apply to Fine's products, specifically. Defendants' prosecutorial history estoppel argument is therefore inapplicable because the quantity and function of the citric acid is still disputed.

Given that there are fact issues involved in both of Defendants' arguments, summary judgment is inappropriate for Stoller's '883 infringement claims. Defendants' motion is hereby DENIED.

## B. Infringement of the '229 Patent

Next, Fine contends that it could not have infringed the '229 Patent as a matter of law because the '229 Patent is invalid under the "on-sale bar" set forth in 35 U.S.C. § 102(a)(1). (Doc. No. 159 at 15). The "on-sale bar" renders a patent invalid if "the claimed invention was . . . on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). The goal of the on-sale bar is to "prevent . . . inventors from filing for patents a year or more after the invention has been commercially marketed." *Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1366-1367 (Fed. Cir. 2016). Defendants seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise. *Eli Lilly Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

Whether the on-sale bar applies is analyzed under the *Pfaff* test. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998). For a patent claim to be held invalid under the on-sale bar, two

conditions must be satisfied before the critical filing date. *Id.* First, the claimed invention must be the subject of a commercial sale. *Id.* A commercial sale is a contract between the parties to give and to pass rights of property for consideration that the buyer pays or promises to pay the seller for the thing bought or sold. 35 U.S.C.A. § 102(a)(1). Second, the claimed invention must be ready for patenting. *Pfaff*, 525 at 68. The second prong of the *Pfaff* test requires the party asserting the on-sale bar defense to prove that the invention allegedly "on-sale" was ready for patenting. It may do so by proof (1) that the invention was reduced to practice before the critical date; or (2) that prior to the critical date the inventor prepared drawings or other descriptions of the invention that were "sufficiently specific to a person skilled in the art to practice the invention." *Id.*

Defendants argue that the on-sale bar applies to the '229 Patent and that it should be found invalid. Specifically, Defendants argue that in 2013, Fine sold the MK-1 formulation, which meets the limitations of the '229 Patent, to WinField when it sent samples of the solution and technical information on producing the solution. Even though this was a private sale, Fine contends that the '229 invention was still on sale before the earliest effective date of the Asserted Patent.

In response, Stoller argues that neither prong of the *Pfaff* test is met. Stoller first argues that Fine did not engage in a "commercial sale" of MK-1 to WinField. Next, Stoller argues that MK-1 was not ready for patenting as the on-sale bar requires. Finally, Stoller argues that even if the on-sale bar was triggered, the experimental use exception applies. (Doc. No. 160 at 10). Both parties appear to agree that Fine's MK-1 formulation meets all the limitations of the asserted claims of the '229 Patent.[4]

---

[4] *See* (Doc. No. 159 at 16) ("The Basic Formulation of MK-1 meets all the limitations of all claims of the '229 Patent"); *See also* (Doc. No. 148-3, Appx. Tab 3, *Stoller's Expert Report by Dr. Prestwich*).

1. Commercial Sale

The issue of whether a commercial sale took place is a question of law for the Court to decide. *See Helsin*, 855 F.3d at 1363 ("Application of the on-sale bar under 35 U.S.C. § 102(a)(1) is ultimately a question of law.").[5] Fine argues that its March 2013 Development Agreement with WinField constitutes a commercial sale for the purposes of the on-sale bar. Fine argues that it developed and sold the MK-1 formulation to WinField more than a year before the earliest effective filing date of the '229 Patent, January 14, 2015. This exchange, Fine argues, renders the '229 Patent invalid. (Doc. No. 159 at 11, 18).

To determine whether a commercial sale took place, the Court must thoroughly examine the Development Agreement. To define "commercial sale," for the purposes of the on-sale bar, the Federal Circuit has looked to the Uniform Commercial Code ("UCC"). *Meds. Co. v. Hospira, Inc.*, 827 F.3d 1363, 1375 (Fed. Cir. 2016). The UCC describes a "sale" as "the passing of title from the seller to the buyer for a price." U.C.C. § 2-106(1). Accordingly, "the passage of title is a helpful indicator of whether a product is 'on sale' as it suggests when the inventor gives up its interest and control over the product." *Meds. Co.*, 827 F.3d at 1375.

The Court finds that the Development Agreement does not document a commercial sale as a matter of law, and therefore the product transferred pursuant to the Development Agreement did not trigger the "on-sale" bar for the '229 Patent. Several factors lead the Court to this conclusion. First, the Development Agreement, by its own terms, suggests that it is not a commercial sale; it states that the parties "desire to engage in certain joint research and

---

[5] In its Response, Stoller urges the Court to look to the expert report of David Cabello in determining whether a commercial sale occurred between Fine and WinField. (Doc. No. 160 at 13). Defendants objected to this evidence in their Reply. (Doc. No. 174 at 18). The Court agrees with Defendants that this is a question of law best answered by the Court. *See Owen v. Kerr McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (expert "opinions on the legal conclusion to be drawn from evidence both invades the court's province and is irrelevant."). The Court will therefore not consider Mr. Cabello's report in addressing this issue.

development efforts concerning the Product(s) **prior to commercializing the Product(s).**" (Doc. No. 159-6, Ex. E at 1) (emphasis added).

Second, Fine did not give up its interest and control over the product in the Development Agreement. Instead, Fine retained a say over how WinField used the product. For example, the Agreement states that "WINFIELD SOLUTIONS agrees not to use the samples supplied by FINE **for any purpose other than for the project without the prior consent of Fine Americas.**" (*Id.* at 2) (emphasis added). Hence, the Court does not find that Fine passed full title of MK-1 to WinField.

Third, Fine provided WinField with the MK-1 samples "free of charge." (*Id.*). While Defendants argue that the free transfer was nevertheless a bargained-for sale because WinField "promise[d] to pay the seller" for future products, this is *not* consideration for the present transfer. (Doc. No. 159 at 13). In fact, the provision promising future payment for future products is actually further evidence that the products transferred pursuant to the Development Agreement were not "on sale" or "sold." The provision states:

> The Parties agree that, **in case** the Project reasonably demonstrates that there is a commercially viable market for the Product(s) **they shall agree on and enter into a supply and distribution agreement** under which FINE AMERICAS shall sell Product(s) to WINFIELD SOLUTIONS, and WINFIELD SOLUTIONS shall purchase, exclusively, the Product(s) from FINE AMERICAS.

(*Id.* at 3) (emphases added). This provision is a conditional promise to enter into a sale in the future, provided that the research and development of MK-1 is successful. It fails to constitute a present sale of the free samples. *See Kollar*, 286 F.3d at 1330 (potential plans to commercialize the invention in the future were irrelevant in determining if a commercial sale took place).

Fourth, as Stoller points out in its Response, Fine could not legally sell MK-1 commercially as it did not have EPA approval at the time. (Doc. No. 160 at 10). Moreover, the

MK-1 samples transferred from Fine to WinField were intended to be used for testing and research—the intent was not for the samples to be used as PGRs.

Considering all of these factors, the Court finds that Defendants have failed to meet their burden of proving as a matter of law that a commercial sale took place in 2013 preceding the effective filing date of the '229 Patent. Accordingly, the patent is not invalid as a matter of law under the "on-sale" bar. Defendants' motion for summary judgment is hereby DENIED on this issue.

2. Ready for Patenting

Even if the Court had found that the Development Agreement constituted a commercial sale, the Court would nevertheless deny summary judgment because Defendants failed to satisfy the second prong of the *Pfaff* test—of proving that as a matter of law the product was "ready for patenting." Despite bearing the burden of proving this, the Defendants failed to brief the issue in their initial motion. (Doc. No. 159). Defendants' attempt to cure this defect in their Reply also fails. They argue that Fine's 2013 transfer to WinField, which included samples, ingredients, and manufacturing instructions related to MK-1, meant that the product was ready for patenting. (Doc. No. 174 at 20).

Setting aside the fact that one cannot bring up new summary judgment topics in one's Reply brief, whether a product is ready for patenting turns on if, prior to the critical date, the "invention is *reduced to practice*; or the invention is depicted in drawings or described in writings of sufficient nature to enable a person having ordinary skill in the art . . . to *practice the invention.*" *GS Cleantech Corp v. Adkins Energy LLC*, 951 F.3d 1310, 1325 (Fed. Cir. 2020). Generally, to prove that an invention was "reduced to practice," there must be some demonstration of the workability or utility of a claimed invention in order to show that the

invention will work for its intended purpose. The proponent must show that the invention works for its intended purpose beyond a probability of failure but not beyond a possibility of failure. *Helsinn*, 855 F.3d 1356, 1372. Mere "fine-tuning" of an invention after the critical date does not mean that the invention was not ready for patenting. *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, 726 F.3d 1370, 1379 (Fed. Cir. 2013).

Defendants failed to brief the issue of whether the MK-1 formulation, in 2013, was fit for its intended purpose. If anything, the Development Agreement highlights that further development, testing, and research were needed on the MK-1 formula and that development amounted to more than just mere "fine-tuning."

In fact, by Defendants' own admission, the MK-1 formula could not pass the EPA's stability testing requirement in 2013, and MK-1 was not ready to commercially sell until 2015.[6] (Doc. No. 160-4, Appx. Tab 33, FINE4702). Given these facts, the Court cannot hold as a matter of law that the 2013 MK-1 was ready for patenting. As such, the Court cannot conclude as a matter of law that the '229 Patent is invalid under the "on-sale" bar. At the very least, a material fact issue exists as to whether the 2013 MK-1 was ready for patenting, and summary judgment is consequently inappropriate as to this prong of the *Pfaff* test.[7]

### C. Willful Infringement

Finally, Defendants ask that the Court grant them summary judgment on Stoller's willful infringement allegations. (Doc. No. 159 at 19). In its Fourth Amended Complaint, Stoller alleged

---

[6] When discussing this fact in their Reply, Defendants argued, correctly, that the product need not be ready to sell or ready for commercial production in order to be deemed "ready for patenting." *See In re Cygnus Telecomms. Tech., LLC Pat. Litig.*, 536 F.3d 1343, 1355 (Fed. Cir. 2008). The Court is not holding that the fact MK-1 was not commercialized until 2015 *dispositively* renders the 2013 MK-1 samples not ready for patenting. Nevertheless, the gap between 2013 and 2015 highlights, at the very least, that a fact issue exists as to whether the MK-1 sample was reduced to practice. Given this fact issue, the Court cannot hold that the "on-sale" bar invalidates the '229 Patent as a matter of law.

[7] Having denied Defendants' motion for summary judgment based on the *Pfaff* test, the Court need not address whether the "experimental use" exception applies.

that Defendants "willfully and knowingly made, used, sold, and/or offered for sale products embodying the patented invention that constitute infringement of [the '883 and '229 Patents] in violation of 35 U.S.C. § 271, *et seq*." (Doc. No. 109 ¶¶ 17, 44).

Prevailing law gives district courts discretion to award enhanced damages against those guilty of willful patent infringement. 35 U.S.C. § 284. Under the Supreme Court's *Halo* decision, patent principles limit the award of enhanced damages to egregious cases of misconduct beyond typical infringement. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 110 (2016). A party seeking enhanced damages for willful patent infringement must show that the infringer's conduct has been willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate. *BillJCo, LLC v. Apple Inc.*, 583 F.Supp.3d 769 (W.D. Tex. 2022).

Courts look to the totality of the circumstances in determining willfulness. *Kemin*, 357 F.Supp.2d at 1129. Knowledge of the allegedly infringed patent continues to be a prerequisite to enhanced damages. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). Relevant factors to a willfulness determination to merit an increase in damages include "whether the infringer, once on notice of the patented invention, investigated the scope of the patent to form a good-faith belief that it was invalid or not infringed." *In re Hayes Microcomputer Prods. Inc. Pat. Litig.*, 982 F.2d 1527, 1543 (Fed. Cir. 1992). While relying on legal advice is a relevant factor to consider, this factor is not determinative. *Minnesota Min. and Mgf. Co. v. Lake Country Mfg., Inc.*, 918 F.Supp. 1307 (D. Minn. 1996).

With regard to the '883 Patent, Defendants argue that upon learning of Stoller's '883 Patent via Stoller's cease-and-desist letter, they immediately initiated a lawsuit seeking Declaratory Judgment that none of their products infringe and that the '883 Patent be found unenforceable due to Dr. Sheth's inequitable conduct. (Doc. No. 159 at 19). With regard to the

'229 Patent, Defendants argue that that as soon as the '229 Patent was added to the present litigation, Fine counterclaimed that it was invalid. (*Id.* at 20). Defendants argue that their good-faith belief in the invalidity of both patents precludes a finding of willful infringement. (*Id.*)

Stoller disagrees and contends that Defendants willingly infringed the '883 Patent and had pre-suit knowledge of the patent.[8] (Doc. No. 160 at 19). For reference, the '883 Patent issued on October 23, 2018, and Defendants received Stoller's cease-and-desist letter about one month later, on or around November 27, 2018. (*Id.*). Defendants filed suit seeking declaratory judgment roughly two months after that, on February 2, 2019.

Stoller argues, however, that Defendants knew of the '883 Patent before the cease-and-desist and continued to willfully infringe. To support this, Stoller points to Defendants' privilege log, which indicates that they sought an opinion of counsel related to the '883 Patent on November 18, 2018. Defendants deny that this log shows knowledge of the '883 Patent and instead contend that the call was about a published United States Patent *Application*. Even assuming Defendants had notice of the '883 Patent on November 18 (as Stoller argues), the Court is not persuaded that Fine's two-and-a-half-month delay from receiving notice to filing for declaratory judgment raises a fact issue of bad-faith or flagrant infringement. Stoller has not presented evidence, much less argued, that Defendants' February lawsuit was filed frivolously or in bad faith. As such, the Court does not see how the reasonable delay between finding out about the patent to filing suit raises a fact issue that Fine infringed with malice, bad faith, or

---

[8] The Court notes that Stoller's Response fails to argue facts, and more importantly fails to provide competent summary judgment evidence, that support a finding of willfulness with regards to the '229 Patent. Thus, the Court finds that Stoller has forfeited its request for enhanced damages on any cause of action for '229 infringement. *See Moayedi v. Compaq Computer Corp.*, 98 Fed. App'x 335, 338 ("Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with 'significant probative' evidence."). Consequently, Defendants' motion for summary judgment is granted to the extent Stoller sought enhanced damages for willful infringement of the '229 Patent.

willfulness. Instead, the timeline shows that upon finding out about the patent, Fine quickly sought legal advice and formed a reasonable belief of noninfringement.

Stoller also points to the deposition of Philip Wikeley, Fine's Technical Director, to raise a fact issue on willfulness. Stoller argues that "Mr. Wikeley refused to provide any factual support for Defendants' position that their infringement was not willful." (Doc. No. 160 at 19). First, the Court notes that Stoller took no action to compel such an answer. More importantly, in a summary judgment context, it is not Defendants' (movant's) burden to refute willfulness, but rather Stoller's burden to establish that it has evidence of willfulness in order to proceed on its claim for enhanced damages.

Here, the Court does not find that a genuine issue of material fact supports a finding of willfulness under *Halo*. Accordingly, summary judgment is hereby GRANTED on this issue, and the Court holds that Stoller is not entitled to enhanced damages a matter of law.

### IV.    Analysis—Plaintiffs' Motions for Partial Summary Judgment

In addition to Defendants' Motion for Summary Judgment, Plaintiffs filed four Motions for Summary Judgment of their own: (1) a Motion for Partial Summary Judgment as to Fine's Inducement of Infringement (Doc. No. 153); (2) a Motion for Partial Summary Judgment Against Fine's Non-Infringing Alternatives (Doc. No. 154); (3) a Motion for Summary Judgment on Defendants' Invalidity Defenses of Anticipation and Obviousness (Doc. No. 155); and (4) a Motion for Summary Judgment as to Counterclaims and Affirmative Defenses Asserting Inequitable Conduct (Doc. No. 156). The Court will address each motion in turn.

**A. Actual Inducement of Infringement**

In Plaintiffs' first Motion for Partial Summary Judgment, they ask the Court to find that Fine infringed the '229 Patent by inducing infringement by WinField.[9] (Doc. No. 153). Specifically, Plaintiffs argue that Fine provided formulations and active ingredients to WinField that WinField then used to make and sell Ascend SL and Ascend PRO products. According to Plaintiffs, these products literally infringe the '229 Patent and, accordingly, Fine induced infringement as a matter of law. Defendants filed a Response (Doc. No. 163), and Plaintiffs filed a Reply (Doc. No. 168).

To establish actual inducement of infringement, a patentee must first prove that there has been direct infringement by a third party. Then, the patentee must prove that the accused infringer, here Fine, knowingly induced infringement and possessed the "specific intent to encourage another's infringement." *Acco Brands, Inc. v. ABA Locks Mfg., Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007).

**1.** Direct Infringement by WinField

Thus, to obtain summary judgment on Fine's actual inducement of infringement by WinField, Stoller must first demonstrate that WinField infringed on the '229 Patent as a matter of law. The parties do not dispute that the MK-1 Formulation, the '229 Patent formulation, and the Accused Products (WinField's Ascend SL and Ascend PRO) are materially the same. *See* (Doc. No. 163 at 3) (Defendants conceding that the "MK-1 Formulation is Materially Identical to the Formulation Stoller Contends Meets the Asserted Claims of the '229 Patent."). In fact, Defendants' own argument for the invalidity of '229 under the on-sale bar is based upon the assumption that the MK-1 formula (the formula that ultimately became the Ascend products) is

---

[9] The Motion does not allege co-Defendants CJB and Vivid have induced any infringement by third-party WinField. (Doc. No. 153 at 1). To the extent that Plaintiffs claim actual inducement of infringement against these Defendants, their motion is hereby denied as to CJB and Vivid.

the same as the '229 Patent. Thus, the Court finds that for the purposes of summary judgment, there is no genuine issue of material fact as to whether the Ascend products literally infringe the '229 Patent—both parties appear to agree that they do.[10]

**2.** Specific Intent to Encourage Another's Infringement

Having found that WinField, a non-party, directly infringed the '229 Patent by making and selling the Ascend products, the Court now turns to the issue of whether Fine induced WinField to infringe.

As noted above, Stoller must prove that Fine knowingly induced infringement and possessed the "specific intent to encourage another's infringement." *Acco Brands*, 501 F.3d at 1312. To find induced infringement, "the only intent required of [the accused infringer] is the intent to cause the acts that constitute infringement." *Golden Blount, Inc., v. Robert H Peterson Co.*, 438 F.3d 1354, 1364 (Fed. Cir. 2006). In other words, Stoller must prove that Fine both knew of the '229 Patent and that the induced acts by WinField constitute patent infringement. *Addiction & Detoxification Inst. LLC v. Carpenter*, 620 Fed. App'x 934, 938 (Fed. Cir. 2015). It follows, then, that mere belief in the invalidity of a patent will not negate the scienter required under the induced infringement statute. *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015).

The following facts are relevant to understanding the parties' arguments on the issue of intent. On March 1, 2013, Fine entered into the confidential Development Agreement with WinField.[11] This Development Agreement transferred samples of MK-1 from Fine to WinField, along with confidential formulas, technical information, and instructions. (Doc. No. 149-5, Appx

---

[10] *See* (Doc. No. 159 at 16) ("The Basic Formulation of MK-1 meets all the limitations of all claims of the '229 Patent"); *See also* (Doc. No. 148-3, Appx. Tab 3, *Stoller's Expert Report by Dr. Prestwich*).
[11] For context, this is the same Development Agreement previously discussed with regards to Defendants' on-sale bar argument.

Tab 8, Ward Depo., pp 53–54, 83–84, 91). The Development Agreement also contained several provisions agreeing to jointly research and develop the formula before commercializing the product. On May 17, 2013, WinField filed its first Confidential Statement of Formula ("CSF") for the MK-1 with the EPA. In October of 2013, Fine and WinField entered into another agreement in which Fine agreed to supply WinField with active ingredients to make the MK-1 Formula, presumably for further testing, research, and development. (Doc. No. 159-9, Ex. H, FINE005326). It appears from the record that, since 2013, Fine has continued selling these active ingredients to WinField in accordance with this agreement. (Doc. No. 163 at 13).

Meanwhile, the earliest effective filing date of Stoller's '229 Patent is January 14, 2015. (Doc. No. 90-2). The '229 Patent was issued in April 2021 and subsequently added to this litigation on May 21, 2021. (Doc. No. 82 at 44).

Stoller argues that the facts above illustrate that Fine knowingly and intentionally induced WinField to infringe by "providing the accused formulation, manufacturing instructions, and active ingredients to WinField." (Doc. No. 153 at 10). What Stoller conveniently ignores is that the bulk of the facts alleged against Fine—with the exception of its ongoing provision of active ingredients to WinField—occurred in 2013, which is well before the earliest effective date of the '229 Patent. Furthermore, while the earliest effective filing date of the '229 Patent is January 2015, arguably the earliest evidence of Fine's knowledge is November 2018, when Stoller sent the cease-and-desist letters for a *different* patent, the '883 Patent.

As noted above, "in contrast to direct infringement, liability for inducing infringement attaches only if the defendant knew of the patent." *Commil*, 575 U.S. at 639; *see also MyMedicalRecords, Inc. v. Jardogs, LLC*, 1 F. Supp. 3d 1020 (C.D. Cal. 2014) (reasoning that a patentee may use the filing of a complaint alleging induced infringement to place the defendant

24

on notice that it allegedly infringes the patents, but this only triggers the defendant's *prospective* liability for *postfiling* conduct). Therefore, given that there is no proof that Fine knew of Stoller's patents prior to November 2018, the Court will not consider Fine's conduct *before* that date for the purpose of Plaintiffs' summary judgment motion on inducement.

After 2018, it appears that the only evidence of allegedly inducing conduct is that Fine continued to supply WinField with active ingredients to make the Ascend products. (Doc. No. 163 at 13). Fine does not deny that it supplied these ingredients to WinField, nor does it deny that the ingredients were supplied at a higher price "to reflect the technology and development work done by [Fine]." (Doc. No. 163 at 6, 10). The Court finds that this evidence, alone, is insufficient to support a finding, at least at the summary judgment stage, that Fine had the specific intent to induce infringement of the '229 Patent as a matter of law.

Therefore, there is a question of fact remaining of whether Fine's continued performance of its contractual obligations with WinField, which were agreed upon before the '229 Patent's earliest effective date, is evidence of intent to induce infringement. Answering this question is left for the fact finder. As such, Plaintiffs' Motion for Partial Summary Judgment on the issue of induced infringement is DENIED.

### 3. Defense under 35 U.S.C. § 273: Prior Commercial Use

Finally, in its Response, Fine argues that it could not have induced infringement of the '229 Patent under 35 U.S.C. § 273, the prior commercial use defense. Specifically, Fine argues that Fine and WinField filed a Confidential Statement of Formulation ("CSF") with the EPA on May 17, 2013, for their MK-1 Formula and that this act constitutes prior commercial use. (Doc. No. 163 at 18). Although the Court has earlier denied Plaintiffs' summary judgment motion on

the issue of induced infringement, it will nevertheless briefly address Defendants' argument to the extent it may affect the future of this litigation.

Under 35 U.S.C. § 273, a party is entitled to a non-infringement defense with respect to a "composition of matter used in a manufacturing or other commercial process, that would otherwise infringe a claimed invention." A party claiming the non-infringement defense must have acted in good faith and commercially used the subject matter at least one year before the earliest effective date of the allegedly infringed patent. 35 U.S.C. § 273(a)(1). "Commercial use," for the purposes of this defense, includes premarketing regulatory review. 35 U.S.C. § 273(c)(1).

Accordingly, Fine argues that by filing a CSF with the EPA in May of 2013, it and WinField engaged in prior commercial use. Since the EPA filing occurred more than one year before January 2015—the earliest effective filing date of the '229 Patent—Fine contends it is entitled to the non-infringement defense under 35 U.S.C. § 273.

In its Reply, Stoller presents three main arguments. First and foremost, Stoller notes that Fine *has not previously raised this defense*, either in its initial Complaint or subsequent Answers and Affirmative Defenses. (Doc. No. 168 at 8). As such, Stoller argues that raising the defense for the first time at the summary judgment stage is improper, and the merits should not be considered. (*Id.*). Second, Stoller argues that it was WinField, *not* Fine, who filed the CSF with the EPA. Thus, if anyone were to be entitled to the prior commercial use defense, it would be WinField. Third and finally, Stoller argues that 35 U.S.C. § 273's commercial use exception does not apply to "pre-development work" like the 2013 MK-1 sample.

Finding that Stoller's first two arguments are more than sufficient to defeat Defendants' newly-raised defense, the Court will not address the merits of whether 35 U.S.C. § 273 applies to

a situation like the one at hand. Defendants have had ample time to raise this defense before the summary judgment stage and have failed to do so. Accordingly, Defendants have waived a prior commercial use defense under 35 U.S.C. § 273, and they may not argue it at trial.

## B. Non-Infringing Alternatives

Plaintiffs' second Motion for Partial Summary Judgment asks that the Court grant them summary judgment on the issue of Defendants' alleged non-infringing alternatives ("NIAs"), which would affect the Court's calculation of reasonable royalties damages. (Doc. No. 154). Plaintiffs argue that the NIAs raised by Defendants were neither adequate nor available in 2018—the time of the hypothetical royalties negotiation—and thus they should not be considered. (*Id.*).

Defendants responded and argued that there are material fact issues regarding the availability and acceptability of Fine's non-infringing alternatives.[12] Therefore, Fine should be permitted to present the issue to a jury.

To assess damages in an infringement suit, plaintiff can seek one of two types of damages. The two alternative categories of infringement compensation are (1) the patentee's lost profits and (2) the reasonable royalty he would have received through arms-length bargaining. 35 U.S.C. § 284. The reasonable royalty theory of damages seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing. *Lucent Techs.,* 580 F.3d at 1325; *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1340 (Fed Cir. 2015).

---

[12] Defendants also argue that "Fine has not willfully infringed Stoller's patents regardless of the availability of non-infringing alternatives." (Doc. No. 166 at 11). The parties did not explain why they chose to discuss the willfulness issue in the context of the narrower, reasonable royalties issue. Nor did the parties supplement their existing briefings on the issue with anything new. The Court has already addressed the parties' existing briefings and arguments regarding willful infringement in Subpart III(C). Accordingly, the Court will limit its analysis to the narrow question of if Plaintiffs are entitled to summary judgment on the issue of whether Defendants had available and adequate NIAs at the time of the 2018 hypothetical negotiation.

Accordingly, this reasonable royalties analysis requires the factfinder to conduct a "hypothetical negotiation" that would have occurred between the parties at the time the infringement began. *Id.* Here, that time would be 2018.

In determining a reasonable royalty, a factfinder may consider evidence concerning the availability and cost of acceptable non-infringing alternatives to the patented invention. *AstraZeneca*, 782 F.3d at 1340. Summary judgment should be granted when there is insufficient evidence that the alleged non-infringing alternative was available. *See Micro Chem.*, 318 F.3d at 1123 (reversing denial of summary judgment regarding no non-infringing alternatives); *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, No. 1:ll-cv-871, 2019 WL 2164090, at *8 (S.D. Ohio May 17, 2019) (granting summary judgment of no non-infringing alternatives); *Nichia Corp. v. Feit Elec. Co., Inc.*, No. CV 20-359-GW-EX, 2022 WL 17222250 , at *25 (C.D. Cal. Oct. 12, 2022) (denying Plaintiff's motion for summary judgment on non-infringing alternatives because Defendants raised a fact issue).

As an initial matter, the parties dispute which party bears the burden of showing the availability and adequacy of NIAs. Each believes the other bears the burden. The Court will resolve this dispute first, as it affects the summary judgment analysis. In their Motion, Plaintiffs elected to seek reasonable royalties damages. Accordingly, they argue that the onus is on Defendants to present NIAs to mitigate the royalty calculation. To be clear, Plaintiffs are *not* seeking lost profits damages.[13] Plaintiffs have, however, presented evidence that, in a hypothetical 2018 negotiation, they would have been reluctant to license and, as a result, would

---

[13] In Stoller's reply, Stoller cites to the record twice to emphasize that it is not seeking lost profits damages. (Doc. No. 169 at 2-3). First, Stoller quotes: "Stoller is not claiming lost profits damages in this case." (Doc. No. 151-2, Appx. Tab 22). Second, Stoller quotes: "Stoller is not seeking lost profits . . ." (Doc. No. 166-5, Ex. B, W. Bratic Expert. Report ¶ 94). Thus, by repeatedly disclaiming lost profits, Stoller has foreclosed this avenue of relief. Accordingly, it may not seek lost profits in the future of this litigation. The Court feels the need to clarify this point so that Stoller cannot later use this Order to argue the *absence* of NIAs after having pushed the burden of presenting NIAs onto Fine at the summary judgment stage.

28

have sought a higher royalty due to expected lost sales and profits. *See* (Doc. No. 166-5, Ex. B, W. Bratic Expert. Report ¶ 94).

Defendants in reply argue that *Plaintiffs*, then, bear the burden of demonstrating the "absence of acceptable, non-infringing substitutes" under the *Panduit* factors.[14] (Doc. No. 166 at 14). They apparently argue that Stoller has converted the reasonable royalties analysis into a lost profits analysis by suggesting that they would have considered lost profits during a hypothetical negotiation.

Plaintiffs highlighted this tactic in reply, arguing that, "Fine attempts to remake Stoller's Reasonable Royalty NIA motion into a Lost Profits *Panduit* factor analysis hoping to switch the burden of proof from Fine to Stoller." (Doc. No. 169 at 2). Plaintiffs argue this burden-shifting is inappropriate because they are not seeking lost profit damages. Accordingly, they argue that it is Defendants' burden to show the presence of available and adequate NIAs.

After examining the relevant law and briefings, the Court agrees with Plaintiffs and finds that it is Defendants' burden to establish that "any alternatives [were] acceptable and available" under reasonable royalties analysis in order to get the benefit of a lower calculation. *Canrig Drilling Tech. Ltd. v. Trinidad Drilling L.P.*, No. H-15-0656, 2016 U.S. Dist. LEXIS 171195, at *11 (S.D. Tex. Dec. 12, 2016). "After all," the *Grain Processing* court noted, "the infringer chose to produce the infringing, rather than the noninfringing, product." *Grain Processing*, 185 F.3d at 1353. Moreover, in a summary judgment context, it is certainly the non-movant's (in this case, Defendants') burden to demonstrate a fact issue. As such, the Court will examine the

---

[14] To recover lost profits, a patent owner "must show causation in fact, establishing that but for the infringement, he would have made additional profits." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011) (internal quotation marks and citations omitted). In general, a patent owner proves lost profits by showing: "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). These four factors are called "the *Panduit* factors." The four factor *Panduit* test "has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damage." *Rite-Hite*, 56 F.3d at 1545.

evidence *presented by Defendants* to evaluate whether *they* have raised a genuine issue of material fact that their alleged NIAs were available and adequate in 2018.

For the Court to consider NIAs in its reasonable royalties analysis, the alleged infringer must show that the NIA was available during the period of infringement. *Grain Processing*, 185 F.3d at 1353. An alleged infringer "need not demonstrate that the non-infringing alternatives in fact existed at the time [of the hypothetical negotiation] but must establish that it was more than 'theoretically possible' and in fact 'available' to be marketed." *Visteon*, 903 F. Supp. 2d at 528 (E.D. Mich. 2012) (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.,* No. 06-348, 2011 WL 197869, at *2 (E.D. Tex. Jan. 20, 2011)). Under *Grain Processing*, the Court must "consider whether, among other things, [the accused infringer] had the necessary equipment, know-how, and experience to implement those non-infringing alternatives" during the period of infringement. *LaserDynamics*, No. 06-348, 2011 WL 197869, at *3.

In addition to being available, the NIA proposed by the infringer must be adequate and acceptable to customers. "To be deemed acceptable, the alleged non-infringing substitute must not 'possess characteristics significantly different from the patented product.'" *SecurityPoint Holdings, Inc. v. United States*, 156 Fed. Cl. 750, 779 (2021) (citing *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991) ("A product lacking the advantages of that patented can hardly be termed a substitute acceptable to the customer who wants those advantages").

Defendants present two potential categories of NIAs. First, they suggest that their own 2021 Formula would have been non-infringing alternatives to the '883 invention in 2018. Second, they suggest that a number of third-party products would have been non-infringing alternatives to the '883 invention. The Court will address both categories of NIAs in turn.

30

### 1. 2021 Formulas

The first proposed category of NIAs is aqueous formulations developed by Fine in November of 2021. These formulas were developed during this litigation, and, at least as of the time of the parties' motions, have not been approved by the EPA or been sold on the market.

In its motion, Stoller claims that Fine cannot present a genuine issue of material fact with its own formula because the 2021 formulations were neither available nor adequate. First, Stoller argues that the 2021 aqueous formulation was not available because its development began in November of 2021, 3 years after the hypothetical negotiation. *See Grain Processing*, 185 F.3d at 1341 (advising that courts should "proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement."). Additionally, Stoller notes that the 2021 formulation does not yet have EPA approval and has never been sold on the market.[15]

Second, Stoller maintains that the 2021 formulation is not an acceptable substitute for its non-aqueous patents because it is aqueous. Fine stated in its response that the 2021 formulation merely added "back a small amount of water to the existing formulation." (Doc. No. 166 at 10). As a formulation consisting of 6% or more water, it is therefore aqueous. (Doc. No. 150-1, Appx. Tab 17, FINE005880-FINE005830). Stoller argues that the very point of the '883 Patent was to overcome the deficiencies of water-based formulas of PGRs. *See* (Doc. No. 149-2, Appx. Tab 5, Prestwich Rebuttal Expert Report). Stoller argues that Fine has not presented evidence that the 2021 formula accomplishes the same function or offers the efficacy of the Accused Products, and therefore, cannot constitute non-infringing alternatives.

In response, Fine argues that its 2021 non-infringing aqueous PGRs could have been available at the time of the hypothetical 2018 negotiation. As noted above, Fine contends that the aqueous solution did not require "designing around the patents," but instead "merely required

---

[15] Fine concedes this point, at least as of the date the response motion was filed (Doc. No. 166).

31

adding back a small amount of water to the formulation." (Doc. 166 at 10) (*citing* Doc. No. 166-1, Ex. A, *Graham Decl.,* 81). Fine concludes that a jury should decide whether Fine had the necessary equipment, know-how, and experience to implement the non-infringing aqueous solution. *See M2M Sols., LLC v. Enforma, Inc.*, 167 F.Supp.3d 665, 682 (D. Del. 2016) ("it remains the province of the jury to credit or discredit the [expert] opinions . . . as to feasibility, commercial acceptability, cost, and availability of their proposed, non-infringing alternatives."). Since Fine was able to develop a non-infringing aqueous solution in 2021 using the same active ingredients, it argues that there is a genuine issue of material fact as to the availability of this NIA.

While Fine may be correct that there is a fact issue regarding the *availability* of the 2021 formulation, Fine has failed to raise a genuine issue of material fact as to its *adequacy*. Fine did not address adequacy in its response brief. It did not present testing, expert opinions, or customer data suggesting that that the aqueous 2021 formulations are as effective as non-aqueous Asserted Patents. It is clear from the record that there were several aqueous PGRs on the market in 2018, and that the USPTO considered these aqueous solutions when granting the '883 Patent. Fine did not present any evidence that its 2021 formulation performed as well as the Asserted Patents or possessed materially the same characteristics as the Asserted Patents (Fine argued only that the active ingredients are the same, but the other aqueous solutions in existence also shared the same active ingredients). Without any evidence to the contrary, the Court agrees with Stoller that Fine's conversion of the 2021 formulation from a non-aqueous solution to an aqueous solution fundamentally changed its properties, characteristics, and performance. As such, the Court hereby GRANTS Stoller's motion on non-infringing alternatives as to Fine's aqueous formulations.

**2.** Third-Party Products, including Aqueous and Granule Formulations

The second proposed category of NIAs is third-party products, comprising of aqueous and granule formulations. Stoller argues that these third-party NIAs (which include Stoller's own Stimulate line of products) were not available, and even if they were available, they were not adequate substitutes for Stoller's non-aqueous solution given that they were aqueous solutions and/or granule PGRs.

The briefing on this second issue is unclear, especially considering the parties' aforementioned disagreement on who bears the burden of proving the availability and adequacy of NIAs. Both parties point the finger at the other for failing to present evidence. For instance, Stoller argues that Fine has not produced any evidence of third-party alternatives from 2018. *See* (Doc. No. 154 at 8-9); *see also Astrazeneca*, 782 F.3d at 1340 (patented third-party formulations were not "available" to infringer for royalty analysis without proof by infringer it could use them, rejecting infringer's conclusory assertions). At the same time, Fine argues that "Stoller provides no analysis of these products," and contends that Fine "should be allowed to rely on Stoller's failure to address [substitute products]." (Doc. No. 166 at 15).

As noted above, in a summary judgment context, the burden is on the non-movant to raise a genuine issue of material fact supporting NIAs in a reasonable royalties analysis. Further, in this context, it is up to Defendants to do so since they are the parties that would benefit from a lower royalties rate. Defendants here, though, have presented no evidence that third-party products at the time would have been available or adequate substitutes in a hypothetical negotiation with Stoller. In Defendants' own characterization of Stoller's motion, they appear to admit that they have not made such an argument.[16]

---

[16] Defendants' Response states: "Stoller's Motion ignores the relevance of [third-party products] by rebutting an argument **Fine never made**. Stoller first asserts, incorrectly, that Fine has argued that Fine itself could purchase and

33

Nevertheless, Defendants argue that whether the substitute products were comparable alternatives "is a question of fact for the jury to consider." (*Id.*). Defendants also argue that "a non-infringing alternative could be different than the accused product and still be acceptable. The key is whether the customer's demand is driven by the patented feature." *See* (*Id.*) (citing *SynQor, Inc. v. Artresyn Techs. Inc.*, No. 2:07-CV-497-TWE-CE, 2011 WL 3625036, at *5 (E. D. Tex. Aug. 17, 2011)). While these two arguments may accurately describe the law, they are devoid of any supporting facts. Defendants have presented no evidence that the aqueous and/or granular third-party products are adequate substitutes or that they were available to Defendants in 2018. The Court will not saddle the trier of fact with an illusory fact issue when Defendants did not provide evidence of acceptable NIAs. As such, Defendants may not rely on these NIAs to lower the reasonable royalties calculation. Stoller's Motion as to Fine's non-infringing alternatives (Doc. No. 154) is hereby GRANTED.[17]

## C. Invalidity Defense of Anticipation and Non-Obviousness

Stoller's third Motion for Partial Summary Judgment addresses two categories of Defendants' invalidity defense under 35 U.S.C. § 102(a): Patents and Printed Publications, and Prior Art. (Doc. No. 155). Under § 102(a), to be invalidating, a reference must be "a printed publication, or in public use, on sale, or otherwise available to the public." 35 U.S.C. 102(a). Defendants argue that the '883 and '229 Patents were anticipated by and obvious in view of prior

---

then resell these third-party products identified by Stoller." (Doc. No. 166 at 14) (emphasis added). Therefore, Fine concedes that it has not argued third-party products were available and adequate NIAs for the purposes of a reasonable royalties calculation, nor has it brought forth evidence to raise an issue of material fact.

[17] In their Response, Defendants argue that, had Stoller hypothetically demanded an unreasonably high royalty in 2018, Defendants would have moved production of the Accused Products to Brazil. (Doc. No. 166). Moving production to Brazil, they argue, would impact infringing sales in the U.S. and would, consequently, mitigate damages in this suit. (*Id.*). Defendants did not cite any cases in which courts have considered potential international production as a relevant factor in determining reasonable royalties NIAs. Thus, meritorious or not, this argument does not affect the narrower issue of whether the two categories of NIAs were adequate and available in 2018. Because the Brazil argument does not impact the availability and adequacy of the specific alleged non-infringing alternatives, the Court grants Stoller's motion notwithstanding this argument, and, although the Court has its doubts, Defendants' ability to make this argument at trial is not affected by this order.

art and printed publications. Stoller urges the Court to find that they were neither anticipated nor obvious as a matter of law. Stoller specifically argues that, with a priority date of January 15, 2015,[18] the Asserted Patents were not (1) anticipated or obvious by the existence of printed publications for Stimulate, Ascend, MK-1, Ascend SL, nor were they (2) anticipated by the prior art of MK-1 and the Ascend formulations. (Doc. No. 170 at 2).

       1.  Prior Publication of Stimulate, MK-1, Ascend SL, and Ascend.

The Court will first address Defendant's argument that the Asserted Patents are invalid under 35 U.S.C. § 102(a) because four products—Stimulate, MK-1, Ascend SL, and Ascend— render the patents obvious. As an initial matter, the parties disagree on what weight should be given to the prior decisions of the Patent Trial and Appeal Board ("PTAB") on this exact issue.

After this litigation commenced, Defendants sought a review of the patentability of Asserted Patents based on prior art consisting of patents or printed publications involving Stimulate, MK-1, and Ascend SL. The PTAB considered the following printed publications: MK-1 Registration, Ascend SL Safety Data Sheet ("SDS"), and Stimulate EPA letter. (Doc. No. 165 at 12). The USPTO did *not* consider any publications regarding Ascend, the fourth prior art alleged here. Based on publications regarding the other three, the PTAB twice declined to institute *inter partes* review ("IPR") as to whether the Asserted Patents were invalid, deciding that the Patents were not anticipated or obvious in light of the prior art. *See* Decision Denying Institution of *Inter Partes* Review 35 U.S.C. §314(a) (Doc. No. 57); *see also* Decision Denying Petitioner's Request for Rehearing under 35 U.S.C. §314; 37 C.F.R §42.71 (Doc. No. 103).

_____

[18] Defendants vaguely argue that Stoller is not entitled to the provisional priority date but rather must use the date of the later, non-provisional application. The Court notes that the priority date is assumed to be that as acknowledged by the Examiner, and the alleged infringer has the burden of proving a different priority date. *Tech. Licensing Corp v. Videotek, Inc.*, 545 F.3d 1316, 1329 (Fed. Cir. 2008). Here, the Examiner explicitly found priority to be the provisional filing date of January of 2015 (Doc. No. 90-2). Finding there to be no proof to the contrary, for the purpose of deciding this summary judgment, the Court will consider the effective date to be January 15, 2015.

Defendants argue, accurately, that the decisions by the PTAB are not binding on the Court. They further argue that the PTAB decisions would not be admissible at a jury trial, since such evidence has been found to be prejudicial. *See Wis. Alumni Rsch. Found. v. Apple, Inc.*, 135 F. Supp. 3d 865, 874–75 (W.D. Wis. 2015). Although this Court is not bound by decisions of the USPTO, the Defendants do not deny that the Court may consider them. (Doc. No 165 at 13).

Under 35 U.S.C. § 282, each claim of a patent shall be presumed valid, and an accused infringer must prove invalidity by clear and convincing evidence. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004). While "the standard of proof does not depart from that of clear and convincing evidence, a party challenging validity shoulders an **enhanced burden** if the invalidity argument relies on the same prior art considered during examination by the [USPTO]." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011) (emphasis added). An added burden of deference to the USPTO is not required, however "with respect to invalidity arguments based on evidence that the USPTO did not consider." *Id.*

Defendants appear to argue that they have presented more evidence to this Court than was presented to the USPTO. Consequently, they conclude that the Court should not apply the enhanced burden. In its Reply, Stoller notes that this enhanced burden of proof "is an argument Stoller has not made and does not make here." (Doc. No. 170 at 4). Seeing as Stoller does not make this contention, the Court does not apply the enhanced burden.

Even without the enhanced burden, though, Defendants face a higher standard in this proceeding than they did in the IPR before the PTAB. Here, Defendants must establish a fact issue concerning invalidity by clear and convincing evidence; by contrast, in the IPR proceeding, Defendants had to show that the challenged claims were invalid "only [by] a preponderance of

the evidence standard." *P&G v. Team Techs., Inc.*, No. 1:12-cv-552, 2014 U.S. Dist. LEXIS 119060, at *33 (S.D. Ohio July 3, 2014). Thus, regardless of whether the Court applied an enhanced burden or deference to the PTAB decision, Defendants would still have to prove the *same* elements by clear and convincing evidence here that they failed to prove by a preponderance of the evidence before the PTAB. Nevertheless, in a summary judgment setting, Defendants need only raise a material issue of fact. After reviewing the Defendants' evidence, the Court does not find that Defendants have raised a genuine issue of fact that the four products invalidate the Asserted Patents.

Defendants' evidence supporting their prior art argument with regard to the first three products, Stimulate, MK-1, and Ascend SL, can be boiled down to the following: (1) the three publications presented to the PTAB, (2) testimony by expert witness Dr. Graham, and (3) the fact that the USPTO has rejected one of Stoller's newly filed patent applications—the "'452 Patent App"—based on Stimulate. (Doc. No. 165 at 11). As an initial matter, Fine's third category of evidence, that a patent application *not implicated in the present litigation* was rejected by the USPTO, is irrelevant to the question of whether the Asserted Patents were anticipated or obvious.

Turning first to the three publications themselves, the Court also cannot see how they raise a fact issue to obviousness of the Asserted Patent. Defendants cite to the publications for Stimulate and the MK-1 formulation (which ultimately became Ascend SL), which are reproduced in pertinent part below.

```
                        STIMULATE

                      Yield Enhancer


Active Ingredients:
    Cytokinin (as kinetin)............................... 0.009%
    Gibberellic acid..................................... 0.005%
    Indole-3-butyric acid............................... 0.005%
Inert Ingredients:....................................99.981%

Total:..................................................100.000%
```

(Doc. No. 165-5, Ex. C).



```
ACTIVE INGREDIENTS
    *Cytokinin, as Kinetin .................................................... 0.090%
    *Gibberellic Acid......... ...................................... .............. 0.030%
    *Indole-3-butyric Acid............................................... 0.045%
OTHER INGREDIENTS........................................................ 99.835%
                                              TOTAL      100.000%
```

(Doc. No. 165-6. Ex. D).

Defendants argue that, by describing the active ingredients in similar concentrations,
these publications render the Asserted Patents obvious. To support a finding of obvious, the non-
movant Defendant must produce evidence that shows "the claimed invention **as a whole** would
have been obvious before the effective filing date of the claimed invention to a person having
ordinary skill in the art." *In re Votel*, 847 Fed. App'x 923, 924 (Fed. Cir. 2021) (emphasis
added). As shown, over 99% of the composition is not disclosed for both solutions, and the
solvent information is similarly omitted. This failure of the publication to teach a specific
solvent, especially when 99% of the formulation is unknown, was an essential finding of the
PTAB when rejecting the MK-1 registration as invalidating prior art. *See* (Doc. No. 57, 103).
Moreover, despite having the same active ingredients, Stimulate is an aqueous solution, and so
could not instruct a POSA to utilize the solvents in the Asserted Patents. Accordingly, the Court

38

rejects Defendants' arguments as to whether these two publications raise an issue of material fact.

The third product forming the basis of Defendants' defense is Ascend SL. Defendants argue that the Ascend SL SDS provides a composition consisting of PRGs "dissolved in propylene glycol solvent." (Doc. No. 151-5, Appx. Tab 25, pp 28-29). Like the two publications above, the Ascend SDS was before the PTAB and was rejected. Moreover, Stoller notes, and Defendants do not dispute, that "the evidentiary record is void of any evidence that the SDS was ever made public." (Doc. No. 155 at 12). That is, there is no evidence it was available outside of the confidential Fine-WinField relationship. (*Id.*). Thus, the Court does not find that Defendants raised a genuine issue of material fact that the Ascend SL SDS anticipated the Asserted Patents or rendered them obvious.

The fourth product alleged to be prior art, Ascend, was not presented to the PTAB. Ascend was an aqueous product sold by Fine for nearly a decade before the earliest effective filing date. Defendants argue that the sale of Ascend and the Ascend registration render the Asserted Patents obvious. (Doc. No. 165 at 14). Defendants argue the Ascend Registration (shown below) renders the Asserted Patents obvious by disclosing the same three active ingredients claimed in the Asserted Patents—indole butyric acid, gibberellin (GA3), and cytokinin—within the concentrations required by the claims of the two Asserted Patents.

| ACTIVE INGREDIENTS | |
|---|---|
| *Cytokinin, as Kinetin | 0.090% |
| *Gibberellic Acid | 0.030% |
| *Indole Butyric Acid | 0.045% |
| OTHER INGREDIENTS | 99.835% |
| TOTAL | 100.000% |

(Doc. No. 165-4, Ex. B).

As shown, the above disclosure strongly resembles the publications on Stimulate and MK-1 that have previously been discussed. Put simply, if the printed publications for Stimulate, MK-1, and Ascend SL did not raise a fact issue for obviousness, why should the Ascend publication be any different? The Ascend publication demonstrates the same active ingredients in allowed concentrations. As with the Stimulate and MK-1 publications, the "other" ingredients in Ascend, which comprise over 99% of the solution, are confidential. The PTAB did not consider this type of "publication" to be worth instituting *inter partes* review on obviousness, and this Court similarly finds that it fails to raise a fact issue on obviousness. Fine has failed to raise an issue of material fact that Ascend, Stimulate, MK-1, or Ascend SL invalidate the Asserted Patents. Stoller's Motion is hereby GRANTED as to the invalidity defense based on these publications.

2. Prior Art Regarding MK-1 and Ascend SL

Finally, in addition to the above publications, Defendants argue that the secret "sale" between Fine and WinField of the MK-1 Formulation, which ultimately became the Ascend SL product, is invalidating prior art. This "sale" was discussed at length with regard to the parties "on-sale" bar arguments.

Here, to constitute invalidating prior art under § 102(a), a reference must be "a printed publication, or **in public use, on sale, or otherwise available to the public.**" 35 U.S.C. 102(a). Fine and WinField's exchange involved an experimental sample, whose existence in a confidential arrangement was not available to the public in any sense of the term. As such, Stoller is entitled to summary judgment on this argument as well. Finding Defendants have failed to raise a genuine issue of material fact supporting their invalidity defense based on prior art or

printed publication, the Court hereby GRANTS Stoller's Motion for Summary Judgment on this issue. (Doc. No. 155).

### D.  Inequitable Conduct Invalidity Defense for the '883 Patent

Plaintiffs' fourth Motion for Partial Summary Judgment asks that the Court grant them summary judgment on Defendants' defense of inequitable conduct for the '883 and '229 Patents. (Doc. No. 156). Plaintiffs refute each of Defendants' grounds for alleging inequitable conduct. Defendants responded (Doc. No. 164) and Plaintiffs replied (Doc. No. 171).

Inequitable conduct is a defense to a patent infringement claim that bars enforcement of a patent. If a party proves inequitable conduct as to any single claim, the entire patent is unenforceable. To establish inequitable conduct, the party seeking to invalidate the patent must show that the patent applicant made misrepresentations or omissions to the USPTO that were both material to patentability and done with the intent to mislead the USPTO. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). *Therasense* set a demanding standard; in addition to proving an omission or misrepresentation, both materiality and intent must be proven by clear and convincing evidence. *Id.* Moreover, the materiality requirement demands but-for materiality. In other words, the proponent must show that the examiner would not have allowed the claim had she been aware of the undisclosed information. *Id.* at 1291. Additionally, to prove intent, the proponent must show that "deceptive intent was the single most reasonable inference to be drawn from the evidence." *United States Water Servs. v. Novozymes A/S*, 843 F.3d 1345, 1353 (Fed. Cir. 2016). When there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336 (Fed. Cir. 2017).

While both materiality and intent must be proven in most cases, a proponent does not have to prove but-for materiality if the proponent can prove that the applicant engaged in "affirmative egregious misconduct." This exception, sometimes called the egregious-misconduct exception, involves "deliberately planned and carefully executed schemes to defraud the USPTO and the courts." *Barry v. Medtronic, Inc.*, 245 F.Supp.3d 793, 811 (E.D. Tex. 2017). The application of the egregious-misconduct exception is rare, and courts have only found it in extraordinary circumstances. *Id.*

Defendants' inequitable conduct assertion is threefold. First, they argue that Stoller misrepresented the '883 Patent's stability and efficacy as compared to competitors, allegedly by altering data from the original provisional application to the utility patent application. This utility patent application ultimately became the '883 Patent.

Second, Defendants argue that Stoller deceptively failed to disclose one of Stoller's own existing plant growth regulators, "Stimulate," to the USPTO. Third (and somewhat vaguely), Defendants argue that Stoller engaged in egregious misconduct by exhibiting a "pattern of misconduct during prosecution." The Court finds that Defendants failed to show a genuine issue of material fact exists regarding any of their three theories of inequitable conduct. As such, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 156) is GRANTED.

### 1. Data Alteration in the '883 Utility Application

Defendants' first allegation of inequitable conduct relates to differences between the '883 original provisional application to the utility patent application that ultimately became the patent. Specifically, Defendants argue that Dr. Ritesh Sheth, one of the '883 Patent's named inventors, deceptively altered data from the provisional application into the non-provisional application. (Doc. No. 164 at 6-7). These data alterations, Defendants argue, made the '883 formulation

42

appear more stable and more effective than competitors' formulations. Defendants rely on the following facts to support their inequitable conduct allegation.

- The non-provisional application **omitted age information** from the competitors' samples. The original application contained indications of how old the competitor samples were (e.g., "3 yrs. old") when they were tested and compared to the '883 formulation. (Doc. No. 159-15, Ex. N at 4-8). The original application contained seven of these age-markers. By contrast, the non-provisional application does not contain age information for the competitor samples in the analogous tables and graphs. Defendants argue that this omission is misleading because it suggests that Stoller's testing compared the '883 formula to *current* competitor samples as opposed to three-year old samples that would have already decayed.

- The non-provisional application **altered the amount of Kinetin present at day 0** in Table 2. (Doc. No. 159-15, Ex. N at 4-5). The original application indicated the amount of Kinetin present at day 0 was 14.2%, meanwhile the non-provisional application indicated that amount was 100%.

- The non-provisional application **altered the amount of GA3 present at day 0** in Table 5. (Doc. No. 159-15, Ex. N at 4-5). The original application indicated the amount of Kinetin present at day 0 was 0.3%, meanwhile the non-provisional application indicated that amount was 100%.

Defendants argue that these data alterations were both material to the '883 Patent prosecution and made with deceptive intent. As such, Defendants argue that they have presented a genuine issue of material fact as to their inequitable conduct defense to enforcement of the '883 Patent.

**a.** Materiality

To survive summary judgment on their inequitable conduct counterclaim, Defendants must show that the data alterations above were material. Determining but-for materiality requires that the Court place itself in the shoes of a patent examiner and determine whether, had the references been before the examiner at the time, the claims of the patent would have still issued. *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017)

Fine argues that testimony by its expert, Dr. Jeffrey Graham, explains why the modified data is material to patentability. (Doc. No. 164 at 8). Fine points to deposition testimony in which Dr. Graham stated that the modified data tables "would have falsely indicated to a person skilled in the art that the 'Competitors' sample was fresh on day 0, when in fact it was depleted." (Doc. No. 164-1 at 35:32-47). Fine argues that Dr. Graham's deposition explains that the true and accurate data is "inconsistent with the position that the 'inventive' samples" have improved stability over competitors. (*Id.* at 49).

To counter, Stoller makes several arguments. First, Stoller notes that the final application expressly incorporated the provisional application, so the Examiner had both sets of data before her. Even with the discrepancies, the final application still contained ample instances of accurate data demonstrating that the '883 Patent was more effective than competitors. Additionally, Stoller presented evidence that it corrected the data with the USPTO as soon as the errors were brought to Stoller's attention. Moreover, the data inconsistencies only affect the '883 formulation's efficacy *as compared to competitors.* Stoller argues that there is no evidence that the '883's efficacy-as-compared-to-competitors had any impact on the issuance of the patent. Importantly, the Examiner never mentioned the competitor data, either before or after the discrepancies were pointed out to her. Stoller concludes that this silence by the Examiner,

combined with the other evidence above, suggests that the '883 Patent would have been issued with or without the data alterations complained of by Defendants.

After examining the evidence, the Court agrees with Stoller and finds that Defendants have not raised a genuine fact issue that the data alterations were but-for material in the '883 Patent's issuance. While Defendants may have some evidence that the alterations were misleading and/or self-serving, this is far from proving but for the mistakes, the '883 would not have issued. Defendants failed to raise a fact issue on but-for materiality and, therefore, cannot survive summary judgment on this theory of inequitable conduct.

      **b.** Intent

In addition to proving but-for materiality, Defendants must prove, or at least raise a fact issue, that the data inaccuracies were made with specific intent to deceive the USPTO. Direct evidence of intent is not required to establish the intent to deceive required to find applicant engaged in inequitable conduct; a court may infer intent from circumstantial evidence. Nevertheless, the Supreme Court requires the defendant to show the following:

> To meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' Indeed, the evidence 'must be sufficient to require a finding of deceitful intent in the light of all the circumstances.' Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found.

*Therasense*, 649 F.3d at 1290-91 (citations omitted).

An inference of intent to deceive is appropriate where the applicant engages in a "pattern of lack of candor," including where the applicant repeatedly makes factual representations "contrary to the true information he had in his possession." *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Cir. 2014).

Fine concludes that the alterations were done in bad faith because the errors were self-serving. *See Cargil, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007) ("self-serving manipulation of highly relevant evidence can hardly be called "good faith"). Fine contends that the modifications suggest a substantial increase in stability of the '883 formulation. The fact that every error was beneficial, Fine argues, is probative circumstantial evidence of intent.

While the self-serving nature of the alterations may lead one to conclude that deception was involved, the evidence of record cited by Fine does not provide a sufficient factual basis that an issue of material fact exists *that the single most reasonable inference* is that Stoller intended to deceive the USPTO. Rather, given the circumstances, a scrivener's error is just as likely (if not more likely) of an explanation for the discrepancies for the following reasons.

First, as Fine admits, the original provisional application that Stoller submitted to the USPTO contained accurate graphs, tables, and data. *See* (Doc. No. 164 at 6). Had Stoller intended to deceive the USPTO by falsely bolstering the '883 Patent's efficacy, it likely would not have given the USPTO accurate, conflicting data in the first place. The fact that Stoller's original application was accurate undercuts any inference that Stoller exhibited "a pattern of lack of candor." *See Apotex*, 763 F.3d at 1362. Given that the provisional application did not contain the "errors" that Fine complains of, the Court cannot say that intent to deceive is the single most reasonable inference to be drawn from the above alterations.

Second, Dr. Sheth's deposition testimony further suggests that the alterations were made inadvertently. When asked about why the data was changed, he stated, "I'm not sure. It must have been inadvertently missed." (Doc. No. 164-4, Ex. A, at 116:5-13). Later, he went on to describe the change as "a transcription error," and explained that the numbers could have been

46

"copy and pasted wrong." (*Id.* at 286-289). Dr. Sheth closed by noting that Stoller had submitted corrections to the Patent Office, saying "once we learned about it, we went ahead and fixed it as quickly as possible." (*Id.* at 292:2-5). Fine argues that this testimony raises a credibility issue best addressed by the fact-finder. This may be true if the issue in question was Dr. Sheth's credibility, but the issue before the Court is whether Fine has raised a material fact issue as to intent to deceive. Even if one totally discredits Dr. Sheth's explanation, Fine has presented no evidence that it was Dr. Sheth who made the changes, or that he knew about the discrepancies before this litigation. The fact of the matter is that, aside from the existence of the errors, Fine has failed to produce any evidence that the errors were intentional, deceptive, or made in bad faith.

Finally, a simple analysis of the errors further undermines the inference of deceptive intent. As noted, Fine points to the alterations of Kinetin and GA3 content in Tables 2 and 4, respectively, to support their inequitable conduct theory. These tables are replicated below from Defendants' Response. (Doc. No. 164 at 8).



*Compare* Dkt. 159, Ex. N (Provisional Application) at 5 *with* Dkt. 159, Ex. B ('883 Patent) at 6-

7. Dr. Sheth's modifications to Table 4, GA3 (Gibberellin) stability data, are shown below:

| Table 4   GA3 Stability data (FIG 3) | 0 | 7 | 14 |
|---|---|---|---|
| Plant Growth Regulators 10 X | 100.0% | 92.3% | 88.7% |
| Plant Growth Regulators 1 X | 100.0% | 95.9% | 95.9% |
| Competitors (Aqueous 3 yrs old) | 0.3% | 1.3% | 1.3% |
| Plant Growth Regulators 1X(Aqueous) | 100.0% | 0.0% | 0.0% |

**Provisional Application**

| TABLE 4 | | | |
|---|---|---|---|
| GA3 Stability data | | | |
| | 0 days | 7 days | 14 days |
| #1 | 100.0% | 92.3% | 88.7% |
| #2 | 100.0% | 94.9% | 94.9% |
| #4 | 100.0% | 1.3% | 1.3% |
| #5 | 100.0% | 0.0% | 0.0% |

**'883 Patent**

*Compare* Dkt. 159, Ex. N (Provisional Application) at 5 *with* Dkt. 159, Ex. B ('883 Patent) at 7.

The allegedly wrongful alterations are sandwiched between rows and rows of data tables. As shown, for both Kinetin and GA3 stability, every other number in the column labeled "0 days" is 100.0%. This fact suggests that Dr. Sheth's testimony to the effect that the errors occurred as a result of a copy and paste error is credible, especially considering that the change would not stick out on first glance.

In conclusion, with regards to its data-alterations theory of inequitable conduct, Fine has failed to offer evidence sufficient to raise a material issue of fact. Aside from the data errors

themselves, Fine has produced no evidence of wrongful intent, or that the alterations were even made by Dr. Sheth himself. Consequently, Plaintiffs' Motion for Partial Summary Judgment is hereby GRANTED as to Defendants' first theory of inequitable conduct.

**2.** Failure to Mention Stimulate

Defendants' second allegation of inequitable conduct relates to Stoller's alleged failure to disclose the existence of prior PGR, "Stimulate." Stimulate, unlike the '883 formulation, is an *aqueous* solution, but it contains the same active ingredients in the same concentrations as the '883 Patent. (Doc. No. 164 at 8). Stoller had manufactured and sold Stimulate for over twenty years before applying for the '883 Patent. (*Id.*).

Defendants argue that Stoller's failure to disclose Stimulate constitutes inequitable conduct, and they point to the following evidence to support this argument. Defendants' expert, Dr. Graham, testified that the asserted claims of the '883 Patent are obvious in light of Stimulate. (Doc. No. 164-1, *Graham. Decl.*). Additionally, according to Defendants, both Dr. Sheth and Ms. Yancy, the prosecuting attorney, knew about the Stimulate product but could not explain why it was not disclosed to the USPTO. Specifically, in her deposition, Ms. Yancy's admitted, "I believe [Stimulate] would be something to copy for the examiner, yes." (Doc. No. 159-14, Ex. M). Further, Defendants argue that Stoller has filed a continuation application claiming priority to the asserted '883 Patent, but the USPTO has rejected this newly filed application based on Stimulate.

With this background in mind, the Court now turns to the *Therasense* test to determine if these allegations raise a genuine issue of material fact as to whether Stoller engaged in inequitable conduct by failing to disclose Stimulate to the USPTO.

### a. Materiality

As mentioned, the first step in the *Therasense* analysis is determining if the misrepresentation or omission would have been but-for material in obtaining the patent. An undisclosed reference is not but-for material if it is merely cumulative; that is, it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the USPTO. *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343 (Fed. Cir. 2017). The first step in determining but-for materiality of a withheld reference (here, Stimulate) is determining the scope of the claims at issue; thus, the Court must first determine the broadest reasonable construction of the claims that the USPTO would have applied during prosecution, and determine whether a reasonable patent examiner would have allowed the claims had she known of the withheld references. *Id.*

Therefore, to survive summary judgment on this allegation of inequitable conduct, Fine must raise a fact issue showing that but-for Stoller's omission of Stimulate, the '883 Patent would not have issued. Fine has failed to do so. While Stoller may not have mentioned Stimulate *by name* during prosecution, Stoller presented numerous data tables (like Tables 2 and 4 discussed above) comparing the '883 formulation to samples of unnamed PGRs. One of these samples, sample #5, is undisputedly an aqueous solution with the exact same active ingredients in the exact same concentration as the '883 formulation. *See* (Doc. No. 156 at 16-17); (Doc. No. 171 at 6); *see also* the '883 Patent (Doc. No. 159-3). The patent examiner, therefore, had notice of an aqueous PGR with the same active ingredients and concentrations as the '883, and nevertheless issued the patent. As Stoller points out in its Reply, "nothing was withheld but the trade name." (Doc. No. 171 at 6).

50

Moreover, the Court is not persuaded that an *aqueous* solution is relevant to patentability of an invention based on the use of a very specific *non-aqueous* solvent category that purportedly enhances stability. Given this fact, Fine cannot present evidence that Stoller's failure to mention Stimulate was but-for material in the issuance of the '883 Patent. Stoller's Motion for Partial Summary Judgment is hereby GRANTED as to Defendants' second theory of inequitable conduct.

### 3. Egregious Misconduct

Finally, Defendants' third allegation of inequitable conduct relates to the egregious-misconduct exception to *Therasense.* Rather than point to any specific carefully executed scheme, Defendants simply reiterate their two main arguments above. In doing so, Defendants argue that Stoller's data alterations and omission of Stimulate amount to a "pattern of misconduct during prosecution," and that, in the aggregate, "Dr. Sheth's conduct evidences a pattern of lack of candor." (Doc. No 164 at 20).

Aside from a few conclusory quotes, Defendants' briefing on this issue is devoid of case law. Defendants point to no examples of cases in which independent instances, neither of which alone would violate *Therasense*, create a pattern of misconduct so outrageous as to fit into *Therasense*'s egregious-misconduct exception. *Therasense* itself is a high bar; *Therasense*'s egregious-misconduct exception is an even higher bar. Defendants' half-hearted attempt to raise a fact issue as to egregious misconduct therefore fails. Thus, Plaintiffs' Motion for Partial Summary Judgment on Defendants' inequitable conduct counterclaim is hereby GRANTED.[19]

---

[19] The discussion above has been limited to inequitable conduct in the '883 Patent prosecution. The parties also presented various arguments about inequitable conduct with regard to the '229 Patent. However, these arguments did not involve any specific allegations of misconduct in the prosecution of '229. Rather, the parties disputed whether or not any '883 misconduct would be imputed to the '229 Patent, and whether or not the successful prosecution of the '229 Patent "cured" any misconduct that may have impacted the '883 Patent. Given that the Court found that there was no inequitable conduct in the '883 prosecution as a matter of law, the Court will not address how any '883 misconduct may have impacted or been impacted by the '229 prosecution.

## V.     Conclusion

For the foregoing reasons, the Court **DENIES IN PART** and **GRANTS IN PART** Defendants' Motion for Summary Judgment (Doc. No. 159). It denies the motion on the two claims of non-infringement but grants it on the claim of willful infringement. The Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment on the issue of Fine's Inducement to Infringement (Doc. No. 153), and **GRANTS** Plaintiffs' Motions for Partial Summary Judgment as to Defendants' Alleged Non-Infringing Alternatives, Defendants' Invalidity defenses of Anticipation and Obviousness for Printed Publication and Prior Art, and Defendants' Counterclaim of Inequitable Conduct (Doc. Nos. 154, 155, and 156).[20]

Signed at Houston, Texas, this 30ᵗʰ day of November, 2023.

Andrew S. Hanen
United States District Judge

---

[20] The Court cautions counsel to follow its rules both in word and in spirit. It seems clear that Stoller filed multiple motions for summary judgment in an apparent effort to circumvent compliance with this Court's rules concerning page limits. This approach is either artful pleading at its best or at its worse. Regardless of how one portrays it, in the future the Court will not consider such motions and will strike them. In the future, a motion for leave to file would be the appropriate approach. Nevertheless, given the complexity of the issues involved herein the Court elected to address them on the merits rather than strike; however, the multiple motions put more pressure on an already overloaded docket and certainly caused a delay in this ruling.